# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

THE EQUAL RIGHTS CENTER, et al.,     \*

\*

\*

v.     \*     Civil Case No. JFM-09-3157

\*

\*

ABERCROMBIE & FITCH CO., et. al.,     \*

\*

\*

\*\*\*\*\*

## MEMORANDUM

Plaintiffs Rosemary Ciotti ("Ciotti") and The Equal Rights Center ("ERC") (collectively, "Plaintiffs") have filed this action against Defendants Abercrombie & Fitch Co., Abercrombie & Fitch Stores, Inc., and J.M. Hollister, LLC, d/b/a Hollister Co. (collectively, "Defendants") under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12181, *et seq.* ("ADA"), and various state law analogues.[1] Plaintiffs seek declaratory judgment and injunctive relief under the ADA and statutory damages (as well as injunctive relief) under the state law provisions. (First Am. Compl. ¶ 331.) Defendants have filed a motion to dismiss Plaintiffs' First Amended Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) on the ground that Plaintiffs lack standing. For the reasons stated below, I find that Plaintiffs have

---

[1] Plaintiffs' state law claims arise under the following statutes: the District of Columbia Human Rights Act, D.C. Code Ann. §§ 2-1401, *et seq.* ("DCHRA"); the Illinois Human Rights Act, 775 Ill. Comp. Stat. Ann. 5/1-101, *et seq.* ("IHRA"); the Massachusetts Public Accommodation Law, M.G.L. c. 272, s. 92A, 98 ("MPAL"); the New Jersey Law Against Discrimination, N.J. Stat. Ann. §§ 10:5-1, *et seq.* ("NJLAD"); the New York Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYHRL"); the Ohio Civil Rights Act, Ohio Rev. Code Ann. §§ 4112.01, *et seq.* ("OCRA"); and the Wisconsin Public Accommodations and Amusement Law, Wis. Stat. § 106.52, *et seq.* ("WPAAL").

standing to assert some, but not all, of their claims.  Defendants' Motion to Dismiss is therefore granted in part and denied in part, and Plaintiffs are granted leave to amend their complaint.

## FACTS AND PROCEDURAL BACKGROUND

ERC is a national non-profit organization devoted to, *inter alia*, ensuring equal rights and opportunities for persons with disabilities.  (First Am. Compl. ¶ 20.)  Ciotti is a member of ERC who is physically disabled and uses a wheelchair for mobility.  (*Id.* ¶ 21.)  Abercrombie & Fitch Co., along with its wholly-owned subsidiaries, Abercrombie & Fitch Stores, Inc. and J.M. Hollister LLC, is a large retailer selling "casual sportswear apparel" under the Abercrombie & Fitch ("A&F") and Hollister Co. ("Hollister") brand names.  (*Id.* ¶ 2.)

The First Amended Complaint alleges that the design and layout of Defendants' stores violates the ADA and various state laws by inhibiting the access of physically disabled persons. Plaintiff Ciotti, while shopping with her nineteen year old daughter, visited two different Hollister stores located in Virginia on three separate occasions in late 2009 and early 2010.  (*Id.* ¶¶ 25-45.)  On these shopping trips, Ciotti alleges that she was "startled to see steps at the main entrance of the store" and had difficulty locating the separate accessible entrance because there was no signage at the main inaccessible entrance.  (*Id.* ¶¶ 29-30.)  Ciotti reports that she "found the existence of a separate, segregated entrance located away from the main entrance used by the majority of the public to be offensive" because she had been "forced to use a segregated entrance solely because of her disability."  (*Id.* ¶¶ 31-32.)  Once inside the store, Ciotti claims that she "experienced significant difficulty navigating throughout the store" because her wheelchair could not fit through narrow aisles cluttered by clothing racks and because she could not reach the sales counter from her seated position in her wheelchair.  (*Id.* ¶¶ 34, 40.)  Despite her negative experiences at Hollister stores, Ciotti recognizes that her "daughter enjoys shopping at Hollister

stores" and that "Hollister stores are very popular with her daughter's age group." (*Id.* ¶ 26.) Accordingly, Ciotti states that she "will continue to visit Hollister stores as long as her daughter is interested in Hollister brand clothing." (*Id.* ¶ 47.)

ERC states in response to reports of complaints "from individuals with disabilities" about access barriers at Defendants' stores, that it "diverted a portion of its scarce resources to perform an accessibility survey of Hollister and A&F stores" in a number of states. (*Id.* ¶ 48.) ERC alleges that this survey revealed numerous unlawful access barriers in A&F and Hollister stores in Maryland, Virginia, District of Columbia, Illinois, Indiana, Massachusetts, New Jersey, New York, Ohio, and Wisconsin. (*Id.* ¶¶ 51-200.) Among the alleged access barriers identified by the survey were stepped store entrances, narrow and obstructed interior paths of travel, high sales and service counters, and inaccessible merchandise displays. (*Id.*) In addition to these survey results, ERC also received complaints about access barriers at two Hollister stores located in Maryland from Chelsea Stanton ("Stanton"), a twenty-one year old ERC member who uses a wheelchair for mobility. (*Id.* ¶¶ 67-84.) The difficulties allegedly encountered by Stanton are substantially similar to those identified by Ciotti. In addition to steps placed at the main entrance of one of the stores, Stanton alleges that she encountered significant access barriers inside both stores, including narrow aisles, high counters, and obstructive merchandise displays. (*Id.* ¶¶ 67-84.) Stanton reports feeling frustrated and humiliated by these barriers, particularly when she was forced to enter the Towson store through a separate side entrance while her friends used the main stepped entrance. (*Id.* ¶ 81.)

ERC filed its original complaint on November 24, 2009, and on May 12, 2010, ERC and Ciotti filed a First Amended Complaint. Count One of the First Amended Complaint alleges violations of the ADA. Counts Two through Eight allege violations of the laws of the District of

Columbia, Illinois, Massachusetts, New Jersey, New York, Ohio, and Wisconsin, respectively. Defendants filed their Motion to Dismiss on May 27, 2010, arguing that Plaintiffs lack standing to pursue their claims in federal court. After the parties had completed briefing on the matter, the United States Department of Justice filed a statement of interest supporting Plaintiffs' assertion of standing.

## DISCUSSION

### I.  Standard of Review

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a claim for lack of subject matter jurisdiction. A defendant may raise a Rule 12(b)(1) issue in one of two ways. First, a defendant may assert that the jurisdictional allegations of the complaint are not true. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Second, and more pertinent to this case, a defendant may contend that even if the jurisdictional allegations in the complaint are true, the complaint is nonetheless insufficient to confer subject matter jurisdiction. *Id.* Where, as here, a 12(b)(1) motion is framed in this manner, a district court must generally accept as true all well-pled factual allegations in the complaint, just as it would when evaluating a 12(b)(6) motion to dismiss. *Id.* As explained by the Supreme Court, however, "[a]lthough for the purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [a court is] not bound to accept as true legal conclusions couched as factual allegations." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) (internal quotations and citation omitted).

### II.  Standing

Defendants ground their motion to dismiss on the theory that Plaintiffs lack standing to pursue their ADA claim in federal court. "Standing concerns 'whether the plaintiff is the proper party to bring the suit.'" *ProEnglish v. Bush*, 70 F. App'x 84, 87 (4th Cir. 2003) (per curiam)

(quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). "[T]he irreducible constitutional minimum of standing contains three elements": (1) an injury-in-fact that is both "concrete and particularized" and "actual or imminent"; (2) a "causal connection between the injury and the conduct complained of"; and (3) a likelihood that the injury "will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations omitted); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). When standing is challenged, the plaintiff bears the burden of proving each of these prongs. *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002).

### A.        Ciotti's Standing

Defendants assert that Ciotti has no standing because she has not suffered an injury-in-fact. Defendants advance two lines of argument in support of this contention: (1) that Ciotti's alleged injury did not arise until after the commencement of the suit; and (2) that Ciotti has not suffered an injury-in-fact because "she does not allege an 'imminent' threat of future injury that is concrete and non-contingent." (Defs.' Mem. at 10.) Neither of these arguments, addressed in turn below, is persuasive, and I conclude that Ciotti has satisfied the constitutional standing requirements.

First, Defendants argue that Ciotti does not have standing for the purposes of this suit because standing, including the alleged injury, "must exist at the commencement of the litigation," *Friends of the Earth, Inc.*, 528 U.S. at 189, and Ciotti's "encounters with limited accessibility at defendants' stores occurred *after* the present litigation commenced on November 24, 2009." (*Id.* at 11.) To understand both the premise and fatal flaw of this argument, a brief review of the timeline of relevant events is helpful: the original Complaint was filed on November 24, 2009; Ciotti's alleged encounters with access barriers at Defendants' stores

occurred in December 2009 and March 2010; and Plaintiffs filed their First Amended Complaint on May 12, 2010. Defendants maintain that the litigation "commenced" with the filing of the original Complaint on November 24, 1999—a date that predates Ciotti's visits to Defendants' stores—and that Ciotti therefore had no basis for standing at the commencement of the action. (Defs.' Mem. at 10.)

This argument fails for several reasons. As an initial matter, Defendants fail to identify a single case (nor can I find one) in which a plaintiff was found to lack standing simply because her alleged injury occurred before the filing of an amended complaint but after the filing of the original. Moreover, it is settled that "an amended pleading ordinarily supersedes the original and renders it of no legal effect." *Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001); *see also Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 552 (5th Cir. 2004) ("[A]n amended pleading completely supersedes prior pleadings."); *EEOC v. IBEW, Local Union No. 24*, 1977 U.S. Dist. LEXIS 16917 (D. Md. Mar. 14, 1977) (same). Thus, the First Amended Complaint, filed May 12, 2010, is the operative pleading in this case. It is undisputed that Ciotti's alleged injuries occurred well prior to this date. Accordingly, for the purposes of the standing inquiry, Ciotti's alleged injuries existed at the commencement of the litigation.[2]

Defendants' second argument is that Ciotti lacks standing to seek an injunction because her alleged injuries occurred in the past and she has failed to show that she will be injured again in the future. (Defs.' Mem. at 10-12.) In support of this position, Defendants emphasize that the First Amended Complaint states that "Ciotti will continue to visit Hollister stores *as long as her*

---

[2] Additionally, dismissing Ciotti's suit on this basis would conflict with the laudable goals of judicial economy and avoidance of duplicative litigation. Even if Ciotti's claims are dismissed for lack of standing, there is no question that this timing issue would not prevent her from simply re-filing her claims again on her own, thus resulting in two parallel proceedings addressing overlapping issues.

*daughter is interested in Hollister brand clothing*." (First Am. Compl. ¶ 47) (emphasis added). Seizing upon the latter part of this statement, Defendants maintain that any potential future injury to Ciotti is merely "speculative" because her return to a Hollister store is contingent upon her daughter's continued interest in Hollister clothing. (Defs.' Mem. at 12.) Defendants argue that since Ciotti's daughter might suddenly lose interest in Hollister clothing, it cannot be said that Ciotti is "likely" to revisit a Hollister store and encounter the alleged access barriers again. *Id.*

While Defendants are correct that "past injury does not necessarily confer standing upon [a plaintiff] to enjoin the possibility of future injuries," *Bryant v. Chesney*, 924 F.2d 525, 529 (4th Cir. 1991), a plaintiff need not prove that she is guaranteed to suffer a future injury in order to have standing. Rather, "a sufficient likelihood" of encountering some future harm is generally sufficient to permit a plaintiff to seek injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). The same rule applies to plaintiffs proceeding under Title III of the ADA: "In ADA cases, courts have held that a plaintiff does not have standing to obtain injunctive relief if he cannot demonstrate a *likelihood* that he will suffer future discrimination at the hands of the defendant." *Gregory v. OTAC, Inc.*, 247 F. Supp. 2d 764, 770 (D. Md. 2003) (emphasis added); *see also Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 825 (D. Md. 1998) ("A plaintiff seeking injunctive relief premised upon an alleged past wrong must demonstrate a 'real and immediate *threat*' of repeated future harm to satisfy the injury in fact prong of the standing test.") (emphasis added). In determining whether a plaintiff has established a sufficient likelihood or threat of future injury in a Title III public accommodations case, courts look to factors such as the plaintiff's proximity to the challenged premises, the plaintiff's stated intention to return to the premises, and the plaintiff's past use of the premises. *See Gillespie v. Dimensions Health Corp.*, 369 F. Supp. 2d 636, 642 (D. Md. 2005); *see also Dempsey v.*

*Harrah's Atl. City Operating Co., LLC*, Civil No. 08-5237, 2009 U.S. Dist. LEXIS 7551, at *8 (D.N.J. Feb. 2, 2009) (applying four factors to determine the likelihood of future injury: "(1) the plaintiff's proximity to the defendants' place of public accommodation; (2) the plaintiff's past patronage at the facility; (3) the definitiveness of the plaintiff's plan to return; and (4) the plaintiff's frequency of travel near the facility").

*Gillespie*, a recent case before this court, provides a helpful example of the standing analysis used in cases brought under Title III of the ADA. There, several deaf plaintiffs sued a hospital for failure to provide a live, in-person sign language interpreter as required by the ADA. *Gillespie*, 369 F. Supp. 2d at 637. The hospital moved to dismiss, arguing that the plaintiffs had not established a likelihood of future injury because it was speculative whether they would again seek treatment from that hospital in the future. *Id.* at 640. The court found, however, that plaintiffs did have standing because they resided just a few miles from the hospital, "making it highly likely that [the defendant hospital], rather than some other medical facility, will be where they go in an emergency." *Id.* at 645. Additionally, the court pointed out that the plaintiffs alleged that they would "likely continue to seek medical treatment" from the hospital. *Id.* at 642. Moreover, some of the plaintiffs had "alleged multiple visits to [the hospital] . . . in the past," a fact that "only bolsters the allegation that they will likely return there in the future." *Id.* at 645. Thus, in light of their proximity to the hospital, stated intention to return, and history of past visits, the court found that the plaintiffs had "sufficiently alleged a real and immediate threat of future injury at the hands of [the defendant hospital] in order to have standing to seek injunctive relief." *Id.* at 645.

*Proctor v. Prince George's Hospital Center*, 32 F. Supp. 2d 830 (D. Md. 1998), another case from this district, applies this same standard but illustrates how key factual differences can

compel a different result. In *Proctor*, a deaf individual who had been injured in a motorcycle accident sued a hospital for failing to provide him with a sign language interpreter as required by the ADA. *Id.* at 831. Unlike *Gillespie*, however, the plaintiff in *Proctor* made no allegations that he lived close to the defendant hospital, had sought treatment there in the past, or had any intention of returning there again in the future. Indeed, the plaintiff "concede[d] that any assertion that he would need to go to [the hospital] in the future would necessarily involve speculation." *Id.* at 833. Unsurprisingly, the court held that the plaintiff lacked standing to seek injunctive relief because the record did not suggest that he would be "likely to return to [the hospital] in the near future." *Id.*

Defendants assert that "the present case falls squarely within the holding in *Proctor*," (Defs.' Mem. at 11), yet close factual analysis, however, demonstrates that *Gillespie* is a far more appropriate analog. As did the plaintiffs in *Gillespie*, Ciotti alleges that she lives only a few miles from the stores in question, (First Am. Compl. ¶ 25), and the stores are "located in the closest major shopping centers to her home." (Pls.' Mem. at 7.) Further, unlike *Proctor*, the First Amended Complaint unquestionably indicates that Ciotti intends to return to Hollister stores in the future: "Ciotti will continue to visit Hollister stores as long as her daughter is interested in Hollister brand clothing."[3] (First Am. Compl. ¶ 47.) Moreover, just as in *Gillespie*, the fact that Ciotti visited these stores three times in the six months preceding the filing of her complaint speaks to the likelihood that she will once again patronize the stores—and encounter the alleged access barriers—in the future. (*Id.* ¶¶ 27-45); *cf. Gillespie*, 369 F. Supp. 2d at 642

_____

[3] Although Defendants emphasize that Ciotti's intent to return is premised upon her daughter's continued interest in Hollister brand clothing, when read in the context of the First Amended Complaint, which provides ample evidence of Ciotti's daughter's interest in Hollister clothes, Ciotti's intent to return to Defendants' stores becomes clear. (*See* First Am. Compl. ¶¶ 25-26 [explaining that "Ciotti's daughter enjoys shopping at Hollister stores and regularly purchases Hollister brand clothing" and that Ciotti and her daughter "enjoy shopping together"].)

("Plaintiffs Gillespie and Hale have alleged multiple visits to Laurel Regional, despite what they allege was unlawful treatment in the past. This fact only bolsters the allegation that they will likely return there in the future.").  In sum, Ciotti resides close to the stores in question, has declared an intention to visit the stores again, and already has visited these stores several times in recent months.  Accordingly, I conclude that Ciotti has alleged a likelihood of future injury sufficient to establish standing to seek injunctive relief under the ADA.[4]

## B.    ERC's Standing

It is well-settled that an organization may allege two types of standing.  The first type, organizational standing, permits a group to allege standing on its own behalf for injuries directly inflicted upon the organization.  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  The second type of standing, variously termed associational or representative standing, enables an organization to sue as a representative of its members who have been harmed.  *Id.*  ERC maintains that it has established both types of standing and brings this action on its own behalf and as a representative of its members.  (First Am. Compl. ¶ 20.)  I find that although ERC has satisfied the constitutional standing requirements of Article III, prudential standing considerations prevent it from establishing organizational standing on its own behalf.  ERC has pled facts sufficient to establish associational standing to seek injunctive relief against certain of Defendants' stores on behalf of its members harmed under the ADA.

---

[4] Defendants do not challenge Ciotti's proof of the remaining elements of constitutional standing, causation and redressability, and it is clear that these requirements are met.  The First Amended Complaint alleges that "all significant business decisions . . . , including store design decisions, are made from the Ohio headquarters of the Abercrombie & Fitch companies."  (First Am. Compl. ¶ 201.)  The complaint further states that "Defendants have capacity and authority to modify their policies, practices, and procedures . . . to eliminate barriers at each Hollister and A&F store."  (*Id.* at ¶ 204.)  Hence, Defendants caused Ciotti's alleged injury by approving the installation of alleged access barriers, and the injunctive relief sought by Ciotti (removal of these access barriers) would adequately redress this harm.

### 1.    Organizational Standing Under Article III

ERC files suit on its own behalf alleging that "it has been damaged by the frustration of its mission, and by having to divert resources that the ERC would have used to provide counseling, outreach and education, and referral services." (First Am. Compl. ¶ 20.)  Conceding that ERC has met the causation and redressability prongs of the standing analysis, Defendants contend only that frustration of an organization's mission and diversion of its resources do not constitute concrete injuries sufficient to confer standing on a plaintiff.  For the reasons that follow, I find that ERC has satisfied Article III's constitutional standing requirements.

An organizational plaintiff suing on its own behalf, like an individual, must satisfy the familiar elements of injury-in-fact, causation, and redressability to establish Article III standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982) ("In determining whether [an organizational plaintiff] has standing under the Fair Housing Act, we conduct the same inquiry as in the case of an individual.").  While it is true that "an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III," *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976), it is also settled that an organization not directly targeted by a defendant's discriminatory practices can still have standing to sue on its own behalf.  In *Havens*, the seminal Supreme Court case regarding organizational standing, a non-profit organizational plaintiff alleged that it had "been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services" and that it "had to devote significant resources to identify and counteract the defendants' racially discriminatory steering practices."  455 U.S. at 379.  Defendants in that case challenged the organization's standing to sue on its own behalf and

argued that these injuries (i.e., frustration of mission and diversion of resources) did not amount to an injury-in-fact. The Court, however, held otherwise:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired [the organization's] ability to provide counseling and referral services for low- and moderate-income home-seekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests. We therefore conclude . . . that in view of [the organization's] allegations of injury it was improper for the District Court to dismiss for lack of standing the claims of the organization in its own right.

*Id.*[5]

Two recent decisions from this court confirm this core principle of *Havens* in the ADA context. In *Equal Rights Center v. AvalonBay Communities, Inc.*, the organizational plaintiff alleged that the defendant's failure to comply with the FHA and ADA directly injured the organization in a way identical to the injury alleged in the current case, namely "by the frustration of its mission and by having to divert significant resources that the ERC would have used to provide counseling, education and referral services." No. AW-05-2626, 2009 U.S. Dist.

---

[5] In interpreting *Havens*, Courts of Appeals have differed as to whether the cost of litigation expenses, standing alone, can constitute an injury-in-fact for standing purposes. *Compare Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) ("*Havens* makes clear, however, that the only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination."), *with Walker v. City of Lakewood*, 272 F.3d 1114, 1124 n.3 (9th Cir. 2001) ("Because we agree that a plaintiff cannot establish standing simply by filing its own lawsuit, we will not consider the time and money the FHF has expended in prosecuting this suit in deciding if the FHF has standing to pursue the retaliation claim."). *See also Equal Rights Ctr. v. AvalonBay Communities, Inc.*, 05-cv-2626, 2009 U.S. Dist. LEXIS 25017, at *13 n.4 (D. Md. Mar. 23, 2009) (noting that the Fourth Circuit has yet to address this issue and collecting cases indicating a split of authority among circuit courts on this question). Yet where, as here, an organization alleges that "it suffered both a diversion of its resources and a frustration of its mission," even the circuits adhering to the more restrictive rule hold that such allegations constitute an injury-in-fact sufficient to confer organizational standing. *See Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, No. 09-55215, 2010 U.S. App. LEXIS 21959, at *9 (9th Cir. Oct. 22, 2010).

LEXIS 25017, at *18 (D. Md. Mar. 23, 2009). In finding that "ERC's allegations are comparable to, and difficult to distinguish from, those made in *Havens*," the court expressly rejected the defendant's argument that these allegations were insufficient to establish injury-in-fact. *Id.* Similarly, in *Equal Rights Center v. Camden Property Trust*, the plaintiff organization alleged that it "had to divert resources to investigate, test, and counteract" the defendant's allegedly discriminatory conduct and that "because of the forced diversion of resources, it has been frustrated in its mission of identifying, challenging, and eliminating discrimination." No. PJM-07-2357, 2008 U.S. Dist. LEXIS 109894, at *18 (D. Md. Sept. 22, 2008). Reasoning that such harms "are precisely the types of injuries that *Havens* and its progeny have held sufficient for Article III standing," the court again held that the diversion of resources and frustration of an organization's mission constituted an injury-in-fact sufficient to confer Article III standing. *Id.*

These cases provide strong support for the proposition that diversion of funds and frustration of an organization's mission are injuries sufficient to establish standing under Article III, and cases cited by Defendants to the contrary are unavailing. In *Shield Our Constitutional Rights & Justice v. Hicks*, the court held that an organizational plaintiff's allegation of diversion of resources was insufficient to constitute an injury-in-fact, but it expressly premised this holding on the plaintiffs' "fail[ure] to allege any specific facts" to substantiate the "bald allegation" that it had to divert resources in response to the defendant's actions. No. DKC-09-0940, 2009 U.S. Dist. LEXIS 103006, at *12 (D. Md. Nov. 4, 2009). In the current case, ERC alleges ample facts to support its contention that Defendants' discrimination frustrated its mission and forced it to divert resources to counteract Defendants' access barriers,[6] making *Shield* inapposite to this case.

---

[6] Plaintiffs allege that: (1) "all significant business decisions . . . , including store design decisions, are made from the Ohio headquarters of the Abercrombie & Fitch companies"; (2) its investigation revealed design and construct violations in eighteen of Defendants' stores in nine

Defendants also rely on *Buchanan v. Consolidated Stores Corp.*, a case from nearly ten years ago in which the district court held that the diversion of resources and frustration of an organization's mission was insufficient to establish injury-in-fact. 125 F. Supp. 2d 730, 737 (D. Md. 2001). That case, however, which did not involve the ADA, has not been followed by this court in recent years: "[T]he court does not find the decision in *Buchanan*, which dealt with a factually different situation that did not include . . . ADA claims, to be controlling in this case." *AvalonBay*, 2009 U.S. Dist. LEXIS at 17 n.5.

Because the cases cited by Defendants are unpersuasive, and because the injuries alleged by ERC are exactly the type deemed sufficient to confer standing in *Havens*, *AvalonBay*, and *Camden Property Trust*, I find that ERC has satisfied its burden of demonstrating that it has suffered an injury-in-fact sufficient to establish organizational standing under Article III.

### 2. Prudential Limitations on Organizational Standing

Although ERC has satisfied the constitutional standing requirements contained in Article III, it must also satisfy the "judicially self-imposed limits on the exercise of federal jurisdiction" in order to bring suit on its own behalf. *Allen v. Wright*, 468 U.S. 737, 751 (1984). These so-called prudential limitations on standing include "the general prohibition on a litigant raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Id.* Defendants maintain that the first of these limitations, the prohibition on raising a third party's rights, is of particular concern in this case. This is because the injuries upon which ERC bases its

---

different states and the District of Columbia; and (3) "ERC diverted a portion of its scarce resources to perform an accessibility survey of Hollister and A&F stores." (First Am. Compl. ¶¶ 201, 51-200, 48.)

organizational standing—frustration of mission and diversion of resources—arise not from discrimination against itself, but rather from alleged discrimination against third parties (namely, disabled individual members of its organization).

Because prudential limitations on standing are not constitutionally required, it is well-established that "Congress may remove them by statute." *Warth*, 422 U.S. at 509-10. I must decide, then, whether Congress has evinced an intent to exempt claims brought under Title III of the ADA from prudential limitations on standing. For the reasons that follow, I conclude that Congress has demonstrated no such intent and that the language of Title III therefore erects a prudential barrier preventing ERC from establishing organizational standing.

Federal courts are in agreement that the language of Titles I and II of the ADA, which grant a remedy to "any person *alleging* discrimination on the basis of disability," signifies a "congressional intention to define standing to bring a private action . . . as broadly as is permitted by Article III of the Constitution," thereby eliminating prudential standing limitations. *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997); *see also A Helping Hand, LLC v. Balt. Cnty.*, 515 F.3d 356, 363 (4th Cir. 2008) (holding that prudential limitations on standing do not apply to Title II ADA claims); *AvalonBay*, 2009 U.S. Dist. LEXIS 25017, at *23 (noting that "several Courts of Appeals have found that prudential standing limitations do not apply to claims under Titles I and II of the ADA."). In contrast to the broad language of Titles I and II, however, Title III of the ADA confers a private right of action only upon a "person who *is being subjected to discrimination* on the basis of disability." 42 U.S.C. §12188(a)(1) (emphasis added). Federal courts have long recognized that "when Congress uses different language in different sections of a statute, it does so intentionally," and so this difference in language, while subtle, is significant. *Fla. Pub. Telecomms. Ass'n v. FCC*, 54 F.3d

857, 860 (D.C. Cir. 1995).  Specifically, the distinction indicates that unlike Titles I and II, under which any person "alleging" discrimination may bring suit (even if not directly subjected to discrimination), a suit under Title III may be brought only by a person directly subjected to or targeted by the alleged discrimination.  Defendants argue that given this construction, the traditional prudential prohibition on asserting the rights of a third party has not been waived by Congress, meaning that organizational plaintiffs such as ERC lack standing in their own right to assert Title III claims stemming from discrimination against third parties.

Two cases have considered this issue at length, and the outcome of both supports Defendants' argument.  In *Clark v. McDonald's Corp.*, as in the instant case, the court considered claims under Title III of the ADA brought by both an individual and a non-profit organization.  213 F.R.D. 198 (D.N.J. 2003).  After finding that the frustration of the organization's mission constituted an injury-in-fact sufficient to satisfy the Article III standing requirements for organizational standing, *id.* at 208, the court tackled the question of whether prudential considerations precluded the organization from asserting a Title III claim.  Following a methodical comparison of the "broadly worded language" of Title II with the narrower language employed by Congress in Title III, the court concluded:

> [T]he language of the enforcement provision of Title III of the ADA does not evince a congressional intent to eliminate a prudential barrier to the standing of an organization to sue to remedy injury it suffers as a result of discrimination against the disabled, where the organization is not itself being subjected to . . . such discrimination.

*Id.* at 210.  Thus, prudential considerations prevented the organization from establishing standing to assert a Title III claim on its own behalf.

An identical conclusion was reached in *Small v. General Nutrition Co.*, 388 F. Supp. 2d 83 (E.D.N.Y. 2005).  In that case, as in *Clark v. McDonald's*, the court relied again on the

distinction between the language of Title II and Title III to determine that Congress did not intend to eliminate general prudential limitations on standing to assert Title III claims. *Id.* at 92-93. The court emphasized that "[t]he difference in statutory language [between Titles II and III] is not insignificant," as the language of Title III "clearly envisions that a plaintiff himself must currently be suffering or be about to suffer discrimination." *Id.* at 92. While acknowledging that such a construction seems curious in light of the exemption of Titles I and II from prudential limitations, the court stressed that "Congress could have used the same language in the enforcement provisions of all three titles *but chose not to do so.*" *Id.* at 93 (emphasis added); *see also Equal Rights Ctr. v. Hilton Hotels Corp.*, No. 07-cv-1528, U.S. Dist. LEXIS 126645, at *13 (D.D.C. Mar. 25, 2009) ("It is peculiar that Congress would provide a more limited right to relief under Title III of the ADA than it did under Title II. But I must presume that when 'Congress uses different language in different sections of a statute, it does so intentionally.'") (citation omitted). Therefore, I must assume that Congress intended the language in Title III to have a different effect than the language in Titles I and II.

In light of the careful reasoning in these two cases, I conclude that Congress has not evinced an intention to eliminate prudential limitations on standing to assert claims under Title III of the ADA. My conclusion is not altered by the line of cases from this district cited by Plaintiffs, though I have considered them at length. Plaintiffs rely principally on *Equal Rights Center v. Equity Residential*, 483 F. Supp. 2d 482 (D. Md. 2007), and *AvalonBay*, 2009 U.S. Dist. LEXIS 25017, two cases which suggest that prudential limitations on standing do not apply to claims brought under Title III of the ADA. These decisions were justified on the grounds that prudential considerations do not apply to claims brought under the FHA or Titles I and II of the ADA, and so prudentially limiting standing in Title III cases could produce anomalous results.

In *Equity Residential*, for example, the court imagined a hypothetical scenario in which a disabled individual has standing under the FHA to obtain relief for an otherwise non-conforming apartment unit, but no standing under Title III of the ADA to obtain relief for a non-conforming parking lot at that same apartment building, thereby preventing access to the very apartment unit remedied by the FHA. 483 F. Supp. 2d at 487 n.7; *see also AvalonBay*, 2009 U.S. Dist. LEXIS, at *24 (quoting *Equity Residential*'s hypothetical scenario). I am unpersuaded by the rationale of these cases for three reasons. First, *Equity Residential*'s hypothetical discussion of prudential limitations on Title III claims was, by the court's own admission, pure dicta and therefore of limited persuasive value. *See* 483 F. Supp. 2d at 487 n.7 ("I need not, at this time, determine . . . whether plaintiff should be afforded standing under the ADA."). Second, neither of these cases even attempts to reconcile or account for the differences in language between Titles II and III of the ADA. Given the admonition that Congress chooses its words carefully and intentionally, *Fla. Pub. Telecomms. Ass'n*, 54 F.3d at 860, the lack of any explanation for the linguistic distinction is troublesome. Third, and perhaps most importantly, the concern raised by the hypothetical scenario is largely artificial because any individual denied access to the parking lot of the building in which she lived would undoubtedly have *individual standing*, in her own right, to pursue injunctive relief under the ADA, notwithstanding any applicable prudential considerations. As discussed above, prudential limitations on standing would *not* prevent a party who was directly subjected to discrimination, such as the hypothetical tenant, from obtaining relief under Title III. Rather, prudential standing rules would preclude only a party not directly targeted by discrimination, such as an organizational plaintiff alleging frustration of mission, from pursuing relief for the non-conforming parking lot. Thus, no anomalous result would obtain from the application of prudential limitations, and the supposed "absurdity" which

concerned the courts in *Equity Residential* and *AvalonBay* is shown to be a purely hypothetical concern.

Because I conclude that Congress has evinced no intention to eliminate prudential limitations on claims brought under Article III of the ADA, ERC will be unable to establish organizational standing unless it can show that an exception to the prohibition on raising a third party's rights applies. The Supreme Court, however, has "limited this exception by requiring that a party seeking third-party standing make two additional showings": (1) that the litigant has a "close" relationship with the third party; and (2) that the third party faces some obstacle to asserting her own right. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). The Fourth Circuit has further clarified that the hurdle preventing a third party from asserting her own rights must be high indeed, as the mere fact that a person is disabled, chronically ill, or indigent does not constitute an obstacle sufficient to bring a case within the exception to the prudential ban. *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 215 (4th Cir. 2002). ERC has failed to make these required showings here. Most obviously, the third party individuals face no impediment to bringing their own suit, as Ciotti's status as a co-plaintiff demonstrates. *See Md. Minority Contractor's Ass'n v. Md. Stadium Auth.*, 70 F. Supp. 2d 580, 589 (D. Md. 1998) ("In this case, there exists no obstacle to a lawsuit by the parties whose rights were allegedly violated by the prequalification requirement, as those parties are themselves plaintiffs."). Thus, the current facts do not implicate the exception to the prudential ban on third party standing.

In sum, I find that prudential limitations on standing apply to claims brought under Title III of the ADA and that ERC has failed to establish standing to assert a third party's claim. Accordingly, ERC lacks organizational standing to assert a claim on its own behalf under Title III of the ADA.

### 3.    Associational Standing

In addition to asserting a claim in its own right, ERC also brings suit "as a representative of its members, whose right to live in and enjoy a community free from discrimination on the basis of physical disability has been infringed by Defendants."  (First Am. Compl. ¶ 20.)  The Supreme Court of the United States has articulated a three factor test for associational standing:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  Defendants in this case contend that ERC has failed to meet the first and third of these requirements and therefore lacks associational standing.  I find, however, that ERC has pled facts sufficient to establish associational standing to seek relief from certain of Defendants' stores on behalf of its members who have been harmed under the ADA.

The Supreme Court has explained that to satisfy the first element of the *Hunt* test, "an organization suing as representative [must] include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association."  *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555 (1996); *see also Piney Run Pres. Ass'n v. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 262 (4th Cir. 2001) ("An association, as the representative of its members who have been harmed, possesses standing to sue if it can show . . . at least one member would otherwise have individual standing."). Defendants maintain that ERC fails *Hunt*'s first prong because ERC does not name or identify its members who allegedly encountered access barriers at Defendants' stores.  (Defs.' Mem. at 17-18.)  Defendants rely on *Maryland Minority Contractor Ass'n v. Maryland Stadium Authority*, a

case in which an organizational plaintiff failed to satisfy the first *Hunt* element because neither a named plaintiff nor a member of the organization was alleged to have been injured by the defendant's conduct. 70 F. Supp. 2d 580, 589 (D. Md. 1998). Defendants apparently argue that because, in their view, Ciotti does not have standing to sue in an individual capacity, ERC has therefore failed to demonstrate that any named plaintiff or member of ERC has suffered an injury-in-fact attributable to Defendants' policies.

This argument fails, however, because the First Amended Complaint makes clear that both a named plaintiff and a member of ERC have been injured by Defendants and would have standing to sue in their own right. First, as discussed above, Ciotti has suffered an injury-in-fact and therefore has standing to sue in an individual capacity. Second, as Defendants concede in their reply briefing, ERC also bases its assertion of representative standing on the allegations of Chelsea Stanton, a non-party ERC member who alleges not only that she encountered access barriers at several Hollister stores, (First Am. Compl. ¶¶ 67-84), but also that "[b]ut for the inaccessibility barriers" at Defendants' stores, she "would return to shop there." (*Id.* ¶ 84.) Just as nearly identical allegations were sufficient to confer standing upon Ciotti, these allegations likewise constitute an injury-in-fact sufficient to confer standing upon Stanton.[7] Thus, the First

---

[7] The only discernable difference between Ciotti's and Stanton's allegations of injury is that Ciotti alleges that she *will* continue to visit Defendants' stores, (First Am. Compl. ¶ 47), while Stanton alleges that she *would* return to shop at Defendants' stores but for the existence of access barriers. (*Id.* ¶ 84.) Title III makes clear, however, that an ADA plaintiff need not actually return to a place with known accessibility barriers simply to establish the likelihood of a future injury. *See* 42 U.S.C. § 12188(a)(1) ("Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this title does not intend to comply with its provisions."). Rather, a plaintiff has standing to seek injunctive relief to remedy an access barrier so long as she "has actually become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation." *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1136-37 (9th Cir. 2002); *see also Clark v. McDonalds Corp.*, 213 F.R.D. 198, 214 (D.N.J. 2003) ("[Section 12188's] language has been interpreted to permit a

Amended Complaint alleges that not one, but two, members of ERC have suffered an injury-in-fact sufficient to support individual standing.

As for the third element of the *Hunt* test, Defendants argue that ERC has failed to establish that neither the relief requested nor the claim asserted requires the participation of individual members in the lawsuit. Specifically, Defendants maintain that individual members of ERC would be required to "provide testimony or other evidence during discovery and at trial" to prove the existence of access barriers at Defendants' stores. (Defs.' Mem. at 18-19.) This argument is unavailing. As an initial matter, ERC seeks declaratory and injunctive relief under the ADA, which is precisely "the type of relief for which associational standing was originally recognized." *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007); *see also Hosp. Council of W. Pa. v. Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991)) ("The Supreme Court has repeatedly held that requests by an association for declaratory and injunctive relief do not require participation by individual association members."). Moreover, although certain individual members—Ciotti and Stanton, for instance—may need to provide testimony and other evidence to establish the existence of access barriers in this case, the Supreme Court has made clear that *Hunt*'s third prong is satisfied "so long as the nature of the claim and of the relief sought does not make the individual participation of *each injured party indispensible* to proper resolution of the cause." *Warth*, 422 U.S. at 511 (emphasis added); *see also Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1267 (4th Cir. 1981) ("The relevant inquiry . . . is whether the claims asserted or the relief requested requires each member to participate

disabled person to sue for injunctive relief under Title III to remedy an architectural barrier, even if he has not actually encountered it, so long as he both has knowledge of its existence and would otherwise visit the public accommodation."). Thus, the fact that Stanton's allegations of injury are couched in "but-for" terms does not prevent her from demonstrating a likelihood of future injury or change the outcome of the standing analysis.

individually in the lawsuit.").  Thus, "an association may assert a claim that requires

participation by *some* members," *Hosp. Council of W. Pa. v. Pittsburgh*, 949 F.2d 83, 89 (3d Cir.

1991), and *Hunt*'s third prong may be satisfied even when the "litigation would likely require

that [individual members] provide discovery and trial testimony."  *Retired Chi. Police Ass'n v.

City of Chi.*, 7 F.3d 584, 601-02 (7th Cir. 1993).  Because only *some* members of ERC would be

required to participate in this suit, the type of claim asserted here does not run afoul of the *Hunt*

test.  Accordingly, ERC has associational standing to pursue declaratory and injunctive relief

under the ADA on behalf of both Ciotti and Stanton.

### 4.      Scope of Relief

Defendants argue that even if ERC has associational standing, this standing is based only

on the allegations of Ciotti and Stanton and is therefore limited to the four stores at which they

encountered alleged access barriers.  (Defs.' Reply at 12 ["ERC could not assert claims 'on

behalf of' Ciotti and Stanton against other stores that they never attempted to patronize."].)

Plaintiffs, meanwhile, sweepingly state that ERC "has standing to sue as to all of Defendants'

stores on behalf of its members."  (Pls.' Mem. at 21.)  I conclude that the answer lies somewhere

between these two poles and that ERC has associational standing to sue on behalf of both named

and unnamed members who are alleged to have suffered harm under the ADA at one of

Defendants' store locations.  Given the allegations in the First Amended Complaint, ERC has

established associational standing to seek injunctive relief against eleven of Defendants' store

locations.

District courts have differed as to how far associational standing will extend in an ADA

case when the defendant is a nationwide chain.  Some courts have held that an organization lacks

representative standing to sue on behalf of unnamed members and therefore can seek injunctive

relief only against those specific locations at which a named member has encountered alleged ADA violations. *See Hilton Hotels*, 2009 U.S. Dist. LEXIS 126645, at *14 (finding allegations that "unnamed members encountered accessibility barriers at various unnamed Hilton hotels" was "simply too vague" to confer associational standing on an organizational plaintiff); *see also Clark v. Burger King Corp.*, 255 F. Supp. 2d 334, 345 (D.N.J. 2003) (holding that the organizational plaintiff "has representative standing to assert ADA violations only in so far as [the named member] has standing"). These courts would require a plaintiff's complaint, in addition to alleging that members of an organization were harmed by accessibility barriers in violation of the ADA, to specifically identify "which members visited which [locations] on which dates and when such members plan to return to these [locations]." *Clark v. Burger King*, 255 F. Supp. 2d at 345. This approach, however, requires too much at the pleadings stage. After all, the Supreme Court has explained that in order to survive a motion to dismiss, a plaintiff need only demonstrate that his allegations "plausibly give rise to an entitlement to relief," *Iqbal*, 129 S. Ct. at 1950, and the mere fact that a member of an organization goes unnamed in a complaint hardly robs otherwise well-pleaded allegations of injury of their plausibility.

An alternative—and in my opinion, wiser—approach holds that when an organization has already satisfied the *Hunt* test and established associational standing as to some members, it may also assert claims on behalf of unnamed members so long as the complaint plausibly alleges that these unnamed members have encountered access barriers on a defendant's premises. In *Clark v. McDonald's*, for example, the defendant, a nationwide fast-food restaurant chain, argued that since the organizational plaintiff's representative standing was based on the alleged injuries of one of its members, "then its [associational] standing is concomitantly limited so as to be coextensive with the standing [that member] enjoys." 213 F.R.D. at 215. The defendant further

claimed that the organization "[could] not advance the claims of its unidentified members" because the complaint did not specifically identify members by name or detail which members visited which stores on which dates. *Id.* The court flatly rejected the defendant's argument and noted that at the pleadings stage "such exactitude has been described . . . as an 'exaggerated' pleading requirement as it relates to associational standing." *Id.* at 215-16 (quoting *Hosp. Council of W. Pa. v. Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991)). Applying this standard, which is consistent with *Iqbal*'s guidance that allegations of injury must be plausible but need not be probable, an organizational plaintiff's representative standing may extend even to claims raised on behalf of unnamed members who have been harmed.

Of course, this does not mean that an organization will necessarily be able to establish representative standing on behalf of every one of its members. Even unnamed members must plausibly allege some sort of cognizable harm in order to enable an organization to assert associational standing on their behalf. *See Piney Run Pres. Ass'n v. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 262 (4th Cir. 2001) ("An association, as the representative of its members *who have been harmed*, possesses standing to sue if it can show . . . at least one member would otherwise have individual standing.") (emphasis added). Yet in this case, Plaintiffs have failed, with two exceptions,[8] to make even general allegations that ERC's unnamed members have encountered any barriers whatsoever in Defendants' stores. Instead, Plaintiffs broadly assert that ERC has associational standing to sue all of Defendants' stores nationwide because all ERC

---

[8] As discussed below, the First Amended Complaint indicates that an unnamed member or members of ERC encountered access barriers at six Hollister stores in Massachusetts and one Hollister store in Wisconsin. (First Am. Compl. ¶¶ 145, 195.) The Complaint also separately states that ERC "receiv[ed] reports of complaints from individuals with disabilities who had been denied access to Defendants' stores across the country," yet Plaintiffs never allege that these complaints came from *members* of ERC. (*Id.* ¶ 48.) Accordingly, these latter allegations provide no basis for ERC to assert representative standing.

members have had their "right to live in and enjoy a community free from discrimination on the basis of physical disability . . . infringed by Defendants." (First Am. Compl. ¶ 20.) Even accepting this averment as true, as I must, the allegation does nothing to show that members of ERC have suffered any harm under the ADA. After all, Title III of the ADA grants relief to a "person who *is being subjected to discrimination* on the basis of disability," not to any person who "live[s] in and enjoy[s] a community" in which discrimination might exist in some form. 42 U.S.C. §12188(a)(1) (emphasis added). Thus, Plaintiffs have failed to plausibly allege that the members of ERC have been harmed under the ADA, and ERC therefore cannot assert associational standing on behalf of its unnamed members.

The First Amended Complaint does state, however, that two of its unnamed members complained of access barriers at six of Defendants' stores in Massachusetts and one store in Wisconsin.[9] (First Am. Compl. ¶¶ 145, 195.) But because the Complaint simply states that "ERC has received complaints from a member" about these stores, Defendants maintain that these allegations are too flimsy to provide a basis for ERC to assert associational standing, as they do not provide the members names or indicate which barriers they encountered. (Defs.' Mem. at 18.) Yet "[s]uch exactitude has been described . . . as an 'exaggerated' pleading requirement as it relates to associational standing," and even general allegations of harm are sufficient to enable an organization asserting representative standing to survive a motion to dismiss. *See Clark v. McDonald's*, 213 F.R.D. at 215-16. Accordingly, this Court holds that as to the seven stores in Massachusetts and Wisconsin, ERC possesses associational standing to

---

[9] These stores are all Hollister stores and are located at the following addresses: 250 Granite Street, Braintree, MA; 200 Dartmouth Mall, Space 1374, Dartmouth, MA; One Patriot Place, Foxboro, MA; 101 Independence Mall Way, Space D117, Kingston, MA; 999 S. Washington Street, N. Attleboro, MA; 2 Galleria Mall Drive, Taunton, MA; and 4301 W. Wisconsin Avenue, Space 832, Appleton, WI. (First Am. Compl. ¶¶ 145, 195.)

seek relief on behalf of the unnamed members who complained of barriers. When these stores are added to the list of four stores visited by Ciotti and Stanton, ERC has associational standing to assert ADA claims on behalf of its members against eleven of Defendants' stores.

The cases cited by Plaintiffs do not persuade me that ERC possesses standing to seek relief as to all of Defendants' stores nationwide. Contrary to Plaintiffs' assertions, these cases do not stand for the proposition that "individuals have standing to bring claims against all facilities in a nationwide chain, even if the individuals did not visit every facility." (Pls.' Mem. at 22.) Indeed, only one of the cases cited by Plaintiffs, *Celano v. Marriott Int'l*, even involved a nationwide chain, and there the court held that the plaintiffs had standing to sue twenty-six golf courses around the country because the plaintiffs alleged that they had *actually been deterred* from playing at these courses. No. 05-4004, 2008 WL 239306, at *7 (N.D. Cal. Jan. 28, 2008) ("All three plaintiffs have attempted to arrange tee times at numerous Marriott courses, but have been unable to play because Marriott advised them that it did not provide accessible carts."); *see also Bacon v. City of Richmond*, 386 F. Supp. 2d 700, 705 (E.D. Va. 2005) (holding that plaintiffs had standing to obtain relief against all facilities within a school district, not just against the four schools that they attended, because "[e]ach plaintiff has expressed a well-founded interest in attending events at facilities other than the four schools mentioned"). Unlike *Celano* or *Bacon*, however, Plaintiffs here make no such allegations about encountering barriers or being deterred from patronizing any of Defendants' stores except the eleven locations identified above. Accordingly, Plaintiffs' contention that they possess standing to obtain relief against each of the hundreds of Defendants' stores all over the country fails to hold water.

Plaintiffs also rely on *Castaneda v. Burger King Corp.*, 597 F. Supp. 2d 1035, 1039 (N.D. Cal. 2009), in which a district court held that the plaintiffs possessed standing to assert

ADA claims against all ninety leased Burger King restaurants in California even though the individual plaintiff had visited only two locations. Yet this decision was expressly premised on the fact that the plaintiffs asserted a class action claim brought on behalf of a class of "at least several thousand members dispersed across California." *Id.* The court in that case held that the plaintiffs "may challenge discrimination *on behalf of a class*" and expressly distinguished the holdings of several contrary cases on the grounds that they "rejected individual, rather than class, claims." *Id.* at 1042, 1045. Because Plaintiffs in this case bring individual claims, *Castaneda*'s class-based rationale is inapplicable. Thus, with the exception of the eleven stores identified above, ERC has failed to establish associational standing to assert ADA claims against every one of Defendants' stores nationwide.

## III.    Supplemental Jurisdiction and Standing to Assert State Claims

Defendants also contend that the Court should dismiss Plaintiffs' state law claims, as stated in Counts Two through Eight of the Complaint, because the Court lacks supplemental jurisdiction over them. (Defs.' Mem. at 21.) Under 28 U.S.C. § 1367(a), a federal court has supplemental jurisdiction over state law claims that are so related to claims in the action within the court's original jurisdiction that they form part of the same case or controversy under Article III of the Constitution. Defendants base their objection to the Court's exercise of supplemental jurisdiction on the grounds that the Court lacks original jurisdiction over Plaintiffs' ADA claims. As discussed above, however, the Plaintiffs' have standing to assert at least some of their ADA claims. Accordingly, the Court may properly exercise supplemental jurisdiction over the remaining state law claims.

Nonetheless, because these state provisions largely mirror the ADA, Plaintiffs have not established standing to obtain injunctive relief under the applicable state law provisions except as

to Counts Four and Eight of the Complaint—those claims brought under the Massachusetts Public Accommodation Law, M.G.L. c. 272, s. 92A, 98 ("MPAL") and the Wisconsin Public Accommodations and Amusement Law, Wis. Stat. § 106.52, *et seq.* ("WPAAL"). Moreover, even as to Counts Four and Eight, ERC lacks associational standing to pursue compensatory damages on behalf of its unnamed members for alleged violations of MPAL and WPAAL. (First Am. Compl. ¶ 331(3).) Traditionally, an application for money damages was considered to be the type of request for relief that would preclude associational standing under *Hunt*'s third prong because damages claims usually require significant individual participation. *See Telecomm. Research & Action Ctr. v. Allnet Comm. Servs., Inc.*, 806 F.2d 1093, 1095 (D.C. Cir. 1986) ("[L]ower federal courts have consistently rejected association assertions of standing to seek monetary, as distinguished from injunctive or declaratory, relief on behalf of the organization's members."). And while the Supreme Court has more recently stated that the third element of the *Hunt* test may be considered only a prudential limitation on standing, *United Food & Commercial Workers*, 517 U.S. at 554-58, I find no indication that the Massachusetts or Wisconsin legislatures intended to eliminate the generally applicable prudential limitations on standing.[10] Because prudential limitations apply under to claims brought under these provisions, and because individual participation would be required to prove a claim for compensatory

---

[10] The antidiscrimination law of the District of Columbia, the DCHRA, D.C. Code Ann. §§ 2-1401, *et seq.*, provides a useful comparison in this regard. Unlike the courts of Massachusetts or Wisconsin, the District of Columbia Court of Appeals has expressly held that prudential limitations do not apply to claims brought under the DCHRA. *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 732 (D.C. 2000); *see also Molovinsky v. Fair Emp't Council of Greater Wash.*, 683 A.2d 142, 146 (D.C. 1996) ("[S]tanding under the DCHRA is co-extensive with standing under Article III.") Given the absence of any such disavowal of prudential limitations in Massachusetts or Wisconsin, I conclude that traditional prudential limitations on standing still apply to claims brought under the antidiscrimination provisions of these states.

damages, the ERC lacks associational standing to assert claims for damages under the Massachusetts and Wisconsin laws.

## **CONCLUSION**

In sum, I find that Ciotti has standing to pursue claims for injunctive and declaratory relief under Title III of the ADA. ERC has associational standing to assert ADA claims on behalf of its members only against eleven of Defendants' stores located in Maryland, Virginia, Massachusetts, and Wisconsin. ERC has standing to assert its state claims for injunctive relief under the laws of Massachusetts and Wisconsin, but it lacks standing to assert claims for damages even under these provisions. Claims as to all other store locations are dismissed.

Thus, I will grant in part and deny in part Defendants' Motion to Dismiss. I recognize, however, that Plaintiffs may be able to amend their Complaint to plausibly allege harm to members at additional store locations. Therefore, the dismissal of Plaintiffs' claims as to all other locations is without prejudice and Plaintiffs are granted leave to amend their Complaint a second time if they can do so under Fed. R. Civ. P. 11.


Date: November 29, 2010                    /s/_____
                                           J. Frederick Motz
                                           United States District Judge